UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



FILED   ORIGINAL
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.   ♭ ₹ F

★ OCT 1 2 2005 ★   C/M

BROOKLYN OFFICE

-------------------------------------------------------------x

GARDEN CITY BOXING CLUB, INC., as
Broadcast Licensee of the June 5, 2004 De La
Hoya/Sturm Program,

              Plaintiff,

    -against-

REYES MORALES, Individually, and as officer,
director, shareholder and/or principal of MI
RANCHITO BAR & RESTAURANT, INC.,
doing business as Mi Ranchito Deli, also
known as Mi Ranchito Deli Restaurant, and MI
RANCHITO BAR & RESTAURANT, INC.,
doing business as Mi Ranchito Deli, also
known as Mi Ranchito Deli Restaurant,

             Defendants.

-------------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 05-CV-0064 (FB) (KAM)

*Appearances:*
*For the Plaintiff:*
JULIE COHEN LONSTEIN, ESQ.
Lonstein Law Office, P.C.
1 Terrace Hill, Box 351
Ellenville, NY 12428

**BLOCK, District Judge:**

        On August 18, 2005, Magistrate Judge Matsumoto issued a Report and

Recommendation ("R&R") recommending that a default judgment of $14,977 plus pre- and

post-judgment interest be entered in favor of plaintiff, Garden City Boxing Club, Inc.

("Garden City"), and against defendants, Reyes Morales ("Morales") and Mi Ranchito Bar

& Restaurant, Inc. ("Mi Ranchito"), jointly and severally. The R&R recited that "[a]ny

objections to this Report and Recommendation must be filed with United States District

Judge Frederic Block within ten days of the date of entry of this Report and

Recommendation," and that "[f]ailure to object within ten days of the date of entry will preclude appellate review by the District Court." R & R at 19. Neither party has filed any objections to the R&R.

If clear notice has been given of the consequences of failure to object, and there are no objections, the Court may adopt the R & R without *de novo* review. *See Thomas v. Arn*, 474 U.S. 140, 149-50 (1985); *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision."). The R&R, which was served on both plaintiff and defendants, *see* Docket Entry 12, informed the parties of their right to object and the consequences of failing to do so.

The Court will excuse the failure to object and conduct *de novo* review if it appears that the magistrate judge may have committed plain error, *see Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 174 (2d Cir. 2000); no such error appears here. Accordingly, the Court adopts the R&R without *de novo* review and directs the Clerk to enter judgment in accordance with the R&R, the full text of which is appended hereto.

**SO ORDERED.**

/s/
FREDERIC BLOCK
United States District Judge

Brooklyn, New York
October 7, 2005

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X

GARDEN CITY BOXING CLUB, INC., *as Broadcast Licensee of the June 5, 2004 De La Hoya/Sturm Program*

         Plaintiff,

     -against-

REYES MORALES, *Individually, and as officer, director, shareholder and/or principal of* MI RANCHITO BAR & RESTAURANT, INC., *doing business as* Mi Ranchito Deli, *also known as* Mi Ranchito Deli Restaurant, and MI RANCHITO BAR & RESTAURANT, INC., *doing business as* Mi Ranchito Deli, *also known as* Mi Ranchito Deli Restaurant.

         Defendants.

---------------------------------------------------------------------- X

**REPORT AND RECOMMENDATION**

05-CV-0064 (FB) (KAM)

MATSUMOTO, United States Magistrate Judge:

      By order dated June 7, 2005, United States District Judge Frederic Block referred this matter, pursuant to 28 U.S.C. § 636(b), to the undersigned magistrate judge for an inquest on damages, upon a motion by plaintiff Garden City Boxing Club, Inc. ("plaintiff"), for a default judgment, to be assessed jointly and severally, against defendants Reyes Morales and Mi Ranchito Bar & Restaurant (collectively, "defendants") for alleged violations of 47 U.S.C. §§ 553, 605(a) and 605(e)(4), and a notation of default by the Clerk of the Court dated April 11, 2005. See Docket No. 7, Motion for Default Judgment; Docket No. 8, Order Referring Motion for Report and Recommendation; Compl. ¶¶ 1, 17-21, 24-27, 30-33; Docket No. 6, Clerk's Notation of Default.

Plaintiff's default motion seeks: (1) statutory damages of up to $10,000 against each defendant under 47 U.S.C. § 605(e)(3); (2) additional statutory penalties of up to $100,000 against each defendant under 47 U.S.C. § 605(e)(3); (3) statutory damages of up to $100,000 against each defendant under 47 U.S.C. § 605(e)(4); (4) statutory damages of up to $10,000 against each defendant under 47 U.S.C. § 553; and (5) additional penalties of up to $50,000 against each defendant under 47 U.S.C. § 553. Plaintiff's complaint also seeks attorneys' fees, costs and interest. See Compl. ¶¶ 20-21, 26-27, 33. Defendants have not made any submissions in opposition to plaintiff's motion, despite receiving notice and an opportunity to do so. See Docket No. 5, Ex. 4, Certificate of Service.

On August 3, 2005, the Court held an inquest on damages, in which plaintiff appeared. Defendants did not appear or submit any opposition to the motion for default judgment despite receiving notice and an opportunity to do so. See Docket No. 10, Certificate of Service.

Based on the information submitted by plaintiff and the testimony presented at the hearing, the Court respectfully recommends that default judgment be entered against defendants, jointly and severally, in the amount of $13,297, inclusive of basic and enhanced statutory damages, attorney's fees of $1,000, and costs of $680, for a total award of $14,977. Furthermore, it is respectfully recommended that this amount accrue interest at the rate of nine percent, pursuant to N.Y. C.P.L.R § 5004 (McKinney 1992) from June 5, 2004 to the entry of judgment and, thereafter, that the judgment accrue interest at the rate provided by law until paid.

# I. BACKGROUND

Plaintiff entered into a license agreement to distribute the broadcast of a boxing match between Oscar De La Hoya and Felix Sturm ("De La Hoya/Sturm match" or the "Event") on June 5, 2004, via closed-circuit television and encrypted satellite signal to commercial establishments for an unspecified licensing fee. See Compl. ¶¶ 12-13; Docket No. 7, Affirmation of Julie Cohen Lonstein in Support of Notice of Motion for Default Judgment ("Lonstein Aff.") ¶¶ 2, 9. The De La Hoya/Sturm match originated via satellite uplink and was re-transmitted to cable systems and satellite companies via cable signal. Compl. ¶ 12. Plaintiff entered into contracts with various entities within the State of New York which granted plaintiff the right to publicly exhibit the Event to their patrons. Id. ¶ 13; Lonstein Aff. ¶ 9.

To identify and prosecute commercial establishments which illegally intercepted its broadcast, plaintiff provided investigative agencies with a list of authorized and legal locations which had paid the required fee for exhibition of the De La Hoya/Sturm match. Lonstein Aff. ¶ 3; see also Affidavit of James Picicci ("Picicci Aff.") at 1, annexed to Lonstein Aff. as Ex. A; Transcript of Civil Cause for Inquest on Damages dated Aug. 3, 2005 ("Tr.") at 23-28. During the broadcast, a team of auditors visited commercial establishments not named on the list. Lonstein Aff. ¶ 3.

Although defendants were not authorized to receive the broadcast (Compl. ¶¶ 15-16), James Picicci ("Picicci"), an investigator for plaintiff who visited the defendant establishment Mi Ranchito (the "establishment"), at 102-10 37th Avenue, Corona, New York, at

approximately 12:10 a.m. on June 6, 2004,[1] saw the De La Hoya/Sturm match on a 27-inch screen television set that was mounted on the wall "on the right side in the middle of the establishment." See Picicci Aff. at 1; Tr. 56-57. During his ten-minute visit to the establishment, Picicci counted the number of people present three separate times; the head counts were 60 each time. See Picicci Aff. at 2; Tr. 53. Although Picicci's affidavit did not indicate how many of the 60 persons were "patrons" as opposed to employees, Picicci clarified at the hearing that his estimate only represented the number of customers whom he observed during his visit. See Picicci Aff. at 2; Tr. 59. Picicci's affidavit also stated that the establishment had a total capacity of approximately 60 people, and included identifying characteristics as "white walls[,] tile floor[,] table[s] and chairs," and a "[k]itchen in the rear." See Picicci Aff. at 1.

Plaintiff asserts that the De La Hoya/Sturm match on June 5, 2004 was not and could not be mistakenly or innocently intercepted by defendants. Lonstein Aff. ¶ 9; Compl. ¶¶ 15-16. Although defendants' specific method of illegally intercepting the signal for the De La Hoya/Sturm match is unknown, plaintiff asserts that defendants could have used any or a combination of the following known methods: (1) the use of a pirate cable box, commonly known as a "blackbox," which, when installed on a cable television line, allows for the descrambled reception of a pay-per-view broadcast; (2) purposefully misrepresenting the commercial establishment as a residential property and thus paying the residential fee for a pay-per-view broadcast, as opposed to the commercial fee; (3) ordering the event for a residence and

---

[1]    For purposes of clarity, the Court notes that the Event began on June 5, 2004, Eastern Daylight Time, but concluded on June 6, 2004.

-4-

moving the residential box to the commercial establishment; or (4) any of the above actions applied similarly to a satellite signal. See Docket No. 7, Ex. 14, Affidavit of Joseph Gagliardi ("Gagliardi Aff.") ¶ 7. According to plaintiff, the most common method of illegally intercepting a signal has been to order residential programming service for use in a commercial establishment. See Tr. 38-40.

## II. DISCUSSION

### A. Liability

When a party moves for judgment against an adverse party in default, the Court, in its discretion, may enter judgment against the defaulting party. Fed. R. Civ. P. 55(b)(2). Plaintiff has made such an application and the defendants have failed to respond to the complaint, or otherwise defend against this action or oppose plaintiff's motion. Judgment by default is therefore appropriate, and it is accordingly respectfully recommended that default be entered against defendants in the amount specified below.

A default constitutes an admission of all well-pleaded factual allegations in the complaint, except for those relating to damages. See Greyhound Exhibitgroup, Inc., v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). That is, a default judgment that is entered on the well-pleaded allegations in a complaint establishes a defendant's liability, see Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995), and the sole remaining issue before the court is whether the plaintiff has provided adequate support for the relief it seeks. Greyhound Exhibitgroup, 973 F.2d at 158.

As noted above, plaintiff's complaint sets forth 47 U.S.C. §§ 553 and 605 as

bases for relief. Plaintiff's papers in support of its motion for default judgment, however, appear

to abandon 47 U.S.C. § 553 to the extent that plaintiff's counsel's affirmation in support of

plaintiff's motion for default judgment is devoid of any discussion of § 553. See, e.g., Lonstein

Aff. ¶ 6. Plaintiff's memorandum of law does, however, touch upon § 553. See Plaintiff's Brief

in Support of Notice of Motion for Default Judgment ("Pl. Br.") at 3. Notwithstanding the

discrepancy between the complaint and plaintiff's motion for default judgment, the Court will

discuss liability under 47 U.S.C. §§ 553 and 605, but limit its consideration of damages to 47

U.S.C. § 605 for the reasons stated below.

> Section 553(a)(1) provides:
>
> No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.
>
> Section 605(a) provides in relevant part:
>
> No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

Plaintiff's complaint appears to establish the elements of liability required to state

claims under both § 553(a)(1) and § 605(a). Section 553(a) applies to "theft of a service from

the point at which it is actually being distributed over a cable system," and § 605(a) will apply in

cases involving broadcasts which are transmitted over the air but are also distributed over a cable

system "to the extent reception or interception occurs prior to or not in connection with,

distribution of the service over a cable system." Int'l Cablevision, Inc. v. Sykes, 997 F.2d 998,

1008 (2d Cir. 1993). Thus, while the Event was conveyed via interstate satellite transmission, plaintiff has alleged that defendants could not have obtained transmission of the Event without performing one of the following illegal acts: using an unauthorized descrambler or "blackbox," misrepresenting the commercial establishment as a residential property and thus paying the residential fee for a pay-per-view broadcast, as opposed to the commercial fee, or ordering the event for a residence and moving the residential box to the commercial establishment. See Gagliardi Aff. ¶ 7. To the extent that the defendants stole services at the point that they were distributed via cable, defendants' acts constitute a violation of § 553(a). See Entm't by J&J Inc. v. Mama Zee Rest. & Catering Servs., Inc., No. 01 Civ. 3945, 2002 WL 202522, at *2 (E.D.N.Y. May 21, 2002).

Section 605(a) has been deemed applicable to thefts of cable communications, as long as the cable programming originated as a radio communication. See Int'l Cablevision, Inc. v. Sykes, 75 F.3d 123, 131 & n.5 (2d Cir. 1996). Defendants' interception of plaintiff's signal constitutes a violation of § 605(a), in that plaintiff alleges that the Event was conveyed via interstate satellite transmission. See Compl. ¶¶ 12, 15-16; KingVision Pay-Per-View Corp., Ltd. v. Tardes Calenas Moscoro, Inc., No. 01 Civ. 9775, 2004 WL 473306, at *2 (S.D.N.Y. Mar. 12, 2004) (holding that defaulting defendant was liable under 47 U.S.C. § 605, where plaintiff's factual allegations referred to "satellite transmissions, which indicate that the broadcast originated with a radio transmission.").

Plaintiff's papers in support of its motion for default judgment state that "[p]laintiff *elects* to recover under [§] 605(a) rather than pursuing damages under both [§] 605(a) and 553(a)(1)." See Lonstein Aff. ¶ 11 (emphasis added). This choice does not belong to

plaintiff—it is well-settled in the Second Circuit that a plaintiff cannot recover under both
§ 553(a) and § 605(a), and that "where a defendant is found to have violated both statutes, the
court should award damages pursuant to 47 U.S.C. § 605." Time Warner Cable v. Taco Rapido
Rest., 988 F. Supp. 107, 110 (E.D.N.Y. 1997) (citing Sykes, 997 F.2d at 1007). Accordingly,
plaintiff's request for damages will be considered only under 47 U.S.C. § 605.

 In addition to seeking damages under § 605(a), plaintiff's complaint also claims
relief pursuant to 47 U.S.C. § 605(e)(4), which provides, in relevant part:

> Any person who manufactures, assembles, modifies, imports, exports,
> sells, or distributes any electronic, mechanical, or other device or
> equipment, knowing or having reason to know that the device or
> equipment is primarily of assistance in the unauthorized decryption of
> satellite cable programming, or direct-to-home satellite services, or is
> intended for any other activity prohibited by subsection (a) of this section,
> shall be fined not more than $500,000 for each violation, or imprisoned
> for not more than 5 years for each violation, or both. For purposes of all
> penalties and remedies established for violations of this paragraph, the
> prohibited activity established herein as it applies to each such device
> shall be deemed a separate violation.

 "As several district courts have recognized, 47 U.S.C. § 605(e)(4), which
addresses the manufacture, assembly, modification, import, export, sale, and distribution of
pirate access devices, is aimed at 'upstream manufacturers and distributors, not the ultimate
consumer of pirating devices.'" DirecTV v. Nezak, No. 03 Civ. 918, 2005 WL 1353618, at *2
(D. Conn. May 10, 2005) (quoting DirecTV, Inc. v. Albright, No. 03 Civ. 4603, 2003 WL
22956416, at *2 (E.D. Pa. Dec. 9, 2003)); see also Kingvision Pay-Per-View, Ltd. v. Ruiz, No.
04 Civ. 6566, 2005 WL 589403, at *1 (S.D.N.Y. Mar. 9, 2005) ("Section 605(e)(4) prohibits the
modification of equipment used to assist in the reception of broadcasts and is 'targeted at the
distributors of cable interception devices . . . and not at the end-users of such devices.'")

(quoting Joe Hand Promotions, Inc. v. Hernandez, No. 03 Civ. 6132, 2004 WL 1488110, at *3

(S.D.N.Y. June 30, 2004)); DirecTV, Inc. v. Borich, No. 03 Civ. 2146, 2004 WL 2359414, at *3

(S.D.W.Va. Sept. 17, 2004).

Plaintiff merely alleges that defendants violated § 605(e)(4) insofar as their agents

or employees "knowingly . . . modified a device or utilized equipment, knowing or having

reason to know that the device or equipment is used primarily in the assistance of the

unauthorized decryption of satellite cable programming." Compl. ¶ 23. There is, however, no

factual assertion to support a finding that defendants are no more than "ultimate consumers" or

"end users" of an illegally modified device, as opposed to "upstream manufacturers and

distributors" of such a device, for purposes of liability under § 605(e)(4). Because the complaint

lacks the necessary factual assertions to support a finding of damages under § 605(e)(4), the

Court will limit its consideration of damages to violations of 47 U.S.C. § 605(a).

**B. Damages**

Under 47 U.S.C. § 605(e)(3)(C)(i)(II), a party may recover an award of statutory

damages "for each violation of subsection (a) . . . involved in the action in a sum of not less than

$1,000 or more than $10,000, as the court considers just." In addition, § 605(e)(3)(C)(ii)

provides that, where "the court finds that the violation was committed willfully and for the

purposes of direct or indirect commercial advantage or private financial gain, the court in its

discretion may increase the award of damages, whether actual or statutory, by an amount of not

more than $100,000 for each violation of subsection (a) . . . ."

While 47 U.S.C. § 605 provides little guidance for assessing damages (see Time

Warner Cable v. Googies Luncheonette, Inc., 77 F. Supp. 2d 485, 489 (S.D.N.Y. 1999);

Cablevision Sys. New York City Corp. v. Diaz, No. 01 Civ. 4340, 2002 WL 31045855, at *3 (S.D.N.Y. July 10, 2002)), courts in this circuit have relied upon one of two methods of calculating statutory damages in cases involving the unauthorized receipt and exhibition of pay-per-view events. See Googies Luncheonette, 77 F. Supp. 2d at 489. The first method bases the award on the number of patrons in the establishment who viewed the broadcast. See, e.g., Kingvision Pay-Per-View Ltd. v. Cardona, No. 03 Civ. 3839, 2004 WL 1490024, at *3 (S.D.N.Y. June 30, 2004) ($20 per patron); Taco Rapido Rest., 988 F. Supp. at 111 ($50 per patron); Cablevision Sys. Corp. v. 45 Midland Enter., Inc., 858 F. Supp. 42, 43 (S.D.N.Y. 1994) ($50 per patron). The second method awards a flat sum for each violation. See, e.g., Entm't by J&J, Inc. v. Suriel, 01 Civ. 11460, 2003 WL 1090268, at *1 (S.D.N.Y. Mar. 11, 2003) (awarding $11,000); Kingvision Pay-Per-View Corp., Ltd. v. Papacito Lidia Luncheonette, Inc., 01 Civ. 7575, 2001 WL 1558269, at *2 (S.D.N.Y. Dec. 6, 2001) (awarding $20,000); Kingvision Pay-Per-View, Ltd. v. Jasper Grocery, 152 F. Supp. 2d 438, 442-43 (S.D.N.Y. 2001) (awarding $15,000). In cases where there is uncontradicted evidence of the number of patrons viewing the match in the establishment, courts have used the first approach and multiplied the number of patrons by a set sum, plus any cover charges or other profits attributable to the unauthorized viewing. See Googies Luncheonette, 77 F. Supp. 2d at 489; see also Cardona, 2004 WL 1490224, at *3; Time Warner Cable v. Sanchez, No. 02 Civ. 5855, 2003 WL 21744089, at *4 (S.D.N.Y. July 8, 2003). This is based on the theory that the patrons who watched the unauthorized broadcast would have ordered it individually for residential use. See Googies Luncheonette, 77 F. Supp. 2d at 490.

According to plaintiff, the residential price to purchase the broadcast of the Event was $54.95. See Affidavit of Joseph Gagliardi in Support of Default, ¶ 7(B); see also Tr. 22. This price, multiplied by an estimated 60 patrons who witnessed the Event, leads to a statutory damages award of $3,297. The Court also notes that a business with a capacity for 50 to 75 patrons would have been charged a licensing fee of approximately $2,300 plus a $250 "tech fee" for authorization to exhibit the Event. See Tr. 13.

Although the $3,297 damages award, as assessed on a per-patron basis, exceeds the $2,550 commercial licensing and other fees that defendants should have paid, the Court respectfully recommends that the higher amount be awarded. Not only is the per-patron calculation supported by other cases in this Circuit, but the higher award is also justified by the increased damages incurred by plaintiff when establishments, which illegally steal broadcasts and provide them to patrons free of charge, siphon other patrons away from other establishments which have properly paid the commercial licensing fee and impose cover charges to recoup some of that investment. See Tr. 14-17. According to plaintiff, establishments that properly contracted to broadcast the event have subsequently demanded considerable discounts, refused to pay the licensing fees, or have become unwilling to purchase future events upon discovering that other establishments in the area had displayed the same broadcasts without paying a licensing fee. Id. Prior court decisions have also noted that "the availability of unauthorized access to programming reduces demand and depresses the prices that the plaintiff can charge." Garden City Boxing Club, Inc. v. Guzman, No. 03 Civ. 8776, 2005 WL 1153728, at *3 (S.D.N.Y. Apr. 26, 2005) (citing Cablevision Systems New York City Corp. v. Faschitti, No. 94

Civ. 6830, 1996 WL 48689, at *2 (S.D.N.Y. Feb. 7, 1996)). Thus, the Court respectfully recommends a statutory damages award of $3,297.

Plaintiff further seeks an enhancement of damages for willfulness up to the statutory maximum of $100,000 pursuant to 47 U.S.C. § 605(e)(3)(C)(ii). See Compl. ¶ 20; Lonstein Aff. ¶ 8. To receive enhanced damages, plaintiff must establish that the violation was willful and that defendants' display of the Event was for "purposes of direct or indirect commercial advantage or private financial gain." See 47 U.S.C. § 605(e)(3)(C)(ii). Courts typically consider the following factors in determining whether a defendant's willful conduct calls for enhanced damages: "repeated violations over an extended period of time; substantial unlawful monetary gains; significant actual damages to plaintiff; defendant's advertising for the intended broadcast of the event; defendant's charging a cover charge or charging premiums for food and drinks." See Kingvision Pay-Per-View, Ltd. v. Recio, No. 02 Civ. 6583, 2003 WL 21383826, at *5 (S.D.N.Y. June 11, 2003) (internal citations omitted).

In this case, plaintiff does not allege that defendants advertised or displayed the fight to entice patrons into the establishment, imposed an admission or cover charge, or that patrons went to the establishment to see the De La Hoya/Sturm match. Plaintiff does allege, however, that defendants have a history of repeated violations. Specifically, plaintiff asserts that defendants illegally broadcast a boxing match on November 27, 2004 between Marco Antonio Barrera and Erik Morales ("Barrera/Morales match"), and have annexed as a supporting exhibit an affidavit submitted by investigator Cosmo Lubrano ("Lubrano"). See Lonstein Aff., ¶ 5; see also Affidavit of Cosmo Lubrano ("Lubrano Aff."), annexed to Lonstein Aff. as Ex. C.

According to this affidavit, Lubrano visited the Mi Ranchito Deli at 102-10 37th Avenue in Queens at 12:15 a.m. on November 28, 2004. Lubrano Aff. at 1. Lubrano reported that a doorman was stationed outside the establishment, and that he did not pay any cover charge. Id. Inside the establishment, which Lubrano described as a "dark/bar restaurant," he observed a 32-inch screen television set at the "rear, near [a] bar," and 75 customers and employees.[2] Id.; see also Tr. 74.

The Picicci and Lubrano Affidavits establish repeated violations at the establishment, although the Court notes several discrepancies between the affidavits regarding the interior of the defendant premises. For instance, Picicci and Lubrano have different estimates of the establishment's maximum capacity and current occupancy at the time of their observations—Picicci estimates capacity and occupancy as 60, Lubrano as 75. In addition, Picicci found the establishment to be "pretty crowded" and observed "people at tables" on the night of the Event, see Tr. at 53-54, while Lubrano described the establishment as "jam-packed" and the crowd as "mostly standing" on the night of the Barrera/Morales match. See Tr. at 68, 77. However, it is conceivable that defendants attracted significantly more customers on the night of the November 2004 Barrera/Morales match than they did on the night of the Event, which took place approximately five months earlier. Furthermore, some of the discrepancies regarding the layout of the establishment could be attributed to renovations that may have occurred over the

---

[2]     The second page of Lubrano's affidavit contains a hand-drawn diagram of the establishment which includes a symbol for a 27-inch screen television, not a 32-inch screen television as noted on the first page of the affidavit. Lubrano Aff. at 2. When inquired about the discrepancy at the hearing, Lubrano testified that the notation on the diagram was in error, and that the size of the television screen was, in fact, 27 inches. Tr. 69.

five month period between the Event and the Barrera/Morales match.[3] Given that Mr. Picicci and Mr. Lubrano independently testified at the hearing that they take notes during their investigations (see Tr. at 51-52, 70) and complete their affidavits as close to night of the investigation as possible (see Tr. at 52-53, 73), and both have submitted photographs of the same location, the Court found their testimony credible, notwithstanding the discrepancies.

Plaintiff is therefore entitled to a further enhancement of the damage award because the record demonstrates that defendants affirmatively and willfully engaged in some deliberate act to intercept the De La Hoya/Sturm match and repeated their willful act to intercept the Barrera/Morales match. Indeed, the facts before this Court establish that defendants' conduct was undoubtedly willful and for the purpose of "reaping commercial profits" from exhibition of the Event. See Guzman, 2005 WL 1153728, at *3. As alleged by plaintiff, it would have been necessary to use an unauthorized decoder, to make misrepresentations identifying Mi Ranchito as a residential customer, or to illegally divert cable service or satellite signals into the establishment. "The illegality of any of these actions would have been apparent to the perpetrator. Moreover, the exhibition of the fight undoubtedly generated commercial profits for the defendant." Id.

In circumstances demonstrating such a willful violation, it is appropriate to assess enhanced damages in conjunction with basic statutory damages. See id. (where court found

---

[3]     The Picicci Affidavit states that, during the June 2004 investigation, the rear of the establishment was occupied by the kitchen and a counter; the Lubrano Affidavit states that during the November 2004 investigation, the television occupied the rear. The Picicci Affidavit states that the right side of the establishment was occupied by the television and jukebox, the Lubrano Affidavit states that this area was occupied by the bar. The Picicci Affidavit describes the interior of the establishment as "white walls tile floor table and chairs" [sic]; the Lubrano Affidavit as "dark/bar restaurant" [sic].

defendant's conduct to be "willful and carried out with the purpose of reaping commercial profits[,]" court awarded enhanced damages in the amount equal to basic statutory damages) (citing <u>Home Box Office v. Champs of New Haven, Inc.</u>, 837 F. Supp. 480, 484 (D. Conn. 1993)). The Court finds that enhanced damages of $10,000 are appropriate in this case. Accordingly, it is respectfully recommended that plaintiff be awarded $3,297 in basic statutory damages and $10,000 in enhanced statutory damages, for a total damages award of $13,297.

## C. Costs

Plaintiff's motion requests attorneys' fees in the amount of $1,000 and costs in the amount of $680 from both defendants. <u>See</u> Lonstein Aff. ¶ 10. An award of costs, including reasonable attorneys' fees, is mandatory under 47 U.S.C. § 605. <u>See</u> 47 U.S.C. § 605(e)(3)(B)(iii). In the Second Circuit, a party seeking an attorneys' fees award "must support that request with contemporaneous time records that show, 'for each attorney, the date, the hours expended, and the nature of the work done.'" <u>Diaz</u>, 2002 WL 31045855, at *5 (quoting <u>New York State Ass'n for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1154 (2d Cir. 1983)).

In support of its request, plaintiff's counsel has provided records of work performed litigating the instant action. Plaintiff's counsel's time record reflects an expenditure of 6.66 hours of attorney time at a rate of $150 per hour, equaling $1,000. See Invoice in Support of Request for Attorney's Fees ("Fees & Costs Aff."), annexed to Lonstein Aff. as Ex. J. Although plaintiff's attorney's submission fails to set for the specific "date" contemplated by the <u>Carey</u> court, because these rates are reasonable (see <u>Martas v. Zaro's Bake Shop, Inc.</u>, No. 98 Civ. 5895, 2002 WL 1267999, at *6 (E.D.N.Y. Mar. 29, 2002); <u>Wells Fargo Bank v.</u>

BrooksAmerica Mortg. Corp., No. 02 Civ. 4467, at *3 (Dec. 1, 2004)), and because the number

of hours expended by counsel do not appear excessive, redundant, or otherwise unnecessary (see

Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)), it is respectfully recommended that the Court

grant plaintiff's request for attorneys' fees in the total amount of $1,000.

The Court has examined plaintiff's request for costs, as well as the documentation

that plaintiff has submitted in support of its request, and finds that it has incurred a total of $680

in costs as follows: process server fees of $180 for service on both defendants, a filing fee of

$150 and investigative expenses of $350 for Mr. Picicci's services. See Lonstein Aff. ¶ 10 &

Ex. H-I. Plaintiff's request for costs is reasonable, and thus it is respectfully recommended that

the Court grant costs in the total amount of $680. See Guzman, 2005 WL 1153728, at *4

(awarding costs consisting of "filing fee, investigative expenses, and the cost of serving

process").

## D. Liability of Individual Defendant

Plaintiff's complaint names both Reyes Morales ('Morales') and the

establishment as defendants. Morales is an officer, director, shareholder and/or principal of the

defendant establishment, Mi Ranchito. See Lonstein Aff. ¶ 6. To establish a contributory

violation of 47 U.S.C. § 605(a), plaintiff must show that Morales "authorized" the violations set

forth in the complaint. See Kingvision Pay-Per-View Ltd. v. Olivares, No. 02 Civ. 6588, 2004

WL 744226, at *5 (S.D.N.Y. Apr. 5, 2004) (quoting Softel Inc. v. Dragon Med. & Sci.

Communications, 118 F.3d 955, 971 (2d Cir.1997)). "To establish vicarious liability, . . .

[plaintiff] must show that . . . [individual defendant] had a 'right and ability to supervise' the

infringing activities and had an obvious and direct financial interest in the exploitation of [the]

-16-

copyrighted materials." Id. (quoting Softel, 118 F.3d at 971).

Based on the undisputed allegations in the complaint, the affidavits in support of plaintiff's motion for a default judgment establish the requisite control and financial interest for defendant Morales (see Lonstein Aff. ¶ 6), and therefore, the Court recommends that Morales is jointly and severally liable for violations of 47 U.S.C. § 605(a), as discussed above. Accordingly, it is respectfully recommended that plaintiff's award be limited to a single recovery against both defendants, jointly and severally.

## E. Interest

Plaintiff also requests interest at a rate of nine percent from June 5, 2004, the date of the unauthorized exhibition of the De La Hoya/Sturm match, until date of judgment, followed by post-judgment interest at the legal rate. See Lonstein Aff. ¶ 9.

When a federal statute is silent with respect to a prejudgment interest rate, the "'common practice' among courts within the Second Circuit is to grant interest at a rate of 9%, the rate of prejudgment interest under New York State law." Serv. Employees Int'l. Union, Local 32BJ v. Stone Park Assoc., LLC, 326 F. Supp. 2d 550 (S.D.N.Y. 2004) (citing N.Y. C.P.L.R. §§ 5001-5004 (McKinney 1992)). Accordingly, because 47 U.S.C. § 605 is silent with respect to a prejudgment interest rate, it is respectfully recommended that plaintiff be awarded prejudgment interest at a rate of nine percent from June 5, 2004 to the date of entry of judgment in this action. See Recio, 2003 WL 21383826, at *6 (awarding nine percent interest rate from date of unauthorized showing of boxing match); Ruiz, 2005 WL 589403, at *2 (same); see also N.Y. C.P.L.R § 5004 (McKinney 1992).

Furthermore, post-judgment interest is available in civil judgments entered in

-17-

federal court from the date of the judgment until paid. <u>See</u> 28 U.S.C. § 1961.  Accordingly, it is

respectfully recommended that post-judgment interest be awarded at the rate provided by law.

# III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that default judgment be entered against defendants, jointly and severally, in the amount of $13,297, inclusive of basic and enhanced statutory damages, attorney's fees of $1,000, and costs of $680, for a total award of $14,977. Furthermore, it is respectfully recommended that this amount accrue interest at the rate of nine percent from June 5, 2004 to the entry of judgment, and that the judgment accrue interest at the rate provided by law until paid.

Any objections to this Report and Recommendation must be filed with United States District Judge Frederic Block within ten days of the date of entry of this Report and Recommendation. Failure to object within ten days of the date of entry will preclude appellate review by the District Court. See Local Civil Rule 6.3; Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); see also Fed. R. Civ. P. 72(a) ("Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order; a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made."). Any requests for extensions of time to file objections should be made to Judge Block.

SO ORDERED.

Dated: August 18, 2005
      Brooklyn, New York

                                   /s/
                                   Kiyo A. Matsumoto
                                   United States Magistrate Judge